UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FRANKIE MORENO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>REDFIN CORPORATION and ROCKET LIMITED PARTNERSHIP d/b/a ROCKET COMPANIES,<br><br>Defendants. | Case No.: 2:26-cv-03915<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Frankie Moreno ("Plaintiff") brings this Class Action Complaint against Redfin Corporation ("Redfin") and Rocket Limited Partnership d/b/a Rocket Companies ("Rocket," and together with Redfin, "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to her own actions and her counsel's investigation, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1. This class action arises from a security incident in which an unauthorized third party accessed Defendants' computer systems and the personally identifiable information ("PII" or



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

"Private Information")[1] of individuals—including, upon information and belief, Defendants' current and former employees—that Defendants collected and stored (the "Data Breach"). As a direct result, Plaintiff and Class Members have suffered fraud, financial and time losses, and the imminent, ongoing threat of further harm from the criminal misuse of their stolen Private Information.

2. Redfin is a residential real estate brokerage that helps people buy and sell homes.[2] Rocket is a homeownership platform and the parent company of Redfin.[3] As a condition of employment, Defendants required their employees, including Plaintiff, to entrust them with highly sensitive Private Information, including names, contact information, dates of birth, Social Security numbers, driver's license numbers, and bank account information.

3. On or about September 23, 2026, Redfin reported the Data Breach to the Massachusetts Office of Consumer Affairs and Business Regulation (the "Notice Letter") disclosing that Redfin had experienced a security incident that "may have resulted in an unauthorized third party accessing [customers' and/or employees'] personal information."[4]

4. Upon information and belief, the Private Information compromised in the Data Breach includes names, Social Security numbers, financial account information, and driver's license numbers.[5]

5. Despite the highly sensitive nature of the Private Information they collected, maintained, and stored, and despite its obligations under federal and state law, including Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, Defendants failed to implement and maintain reasonable and adequate data security measures sufficient to protect Plaintiff's and

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] *Why Redfin*, REDFIN, https://www.redfin.com/why-redfin (last visited Oct. 13, 2026).

[3] *About Us*, ROCKET COMPANIES, https://www.rocketcompanies.com/who-we-are/about-us/ (last visited Oct. 13, 2026).

[4] *Notice of Security Incident, Redfin Corporation* (Sept. 23, 2026), MASS. OFF. OF CONSUMER AFFS. & BUS. REGUL., https://www.mass.gov/doc/2026-1615-redfin-corporation/download (last visited Oct. 13, 2026).

[5] *2026 Data Breach Notification Report*, MASS. OFF. OF CONSUMER AFFS. & BUS. REGUL., https://www.mass.gov/doc/data-breach-report-2026/download (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Class Members' Private Information from the foreseeable risk of unauthorized access and exfiltration.

6. Defendants, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information they maintained for Plaintiff and Class Members, causing the exposure of Plaintiff's and Class Members' Private Information.

7. Defendants further compounded Plaintiff's and Class Members' injuries through a deficient notice process. To date, Defendants have failed to disclose when the Data Breach occurred, how long the unauthorized actor had access to Defendants' systems, when Defendants discovered the Data Breach, how the Data Breach occurred, or precisely what information was taken—depriving affected individuals of the information they need to take prompt and targeted protective action.

8. Defendants also failed to delete or adequately secure Private Information they no longer needed. Plaintiff, for example, last worked for Redfin in November 2022, yet, upon information and belief, Defendants continued to maintain her Private Information on their systems nearly four years later, at the time of the Data Breach.

9. As a direct and proximate result of Defendants' failures, Plaintiff and Class Members have suffered and will continue to suffer injuries, including but not limited to: (a) the unauthorized access, exfiltration, and exposure of their Private Information; (b) actual and attempted fraud; (c) loss of the benefit of the bargain; (d) loss of the value of their privacy and confidentiality in their Private Information; (e) the present and continuing heightened risk of identity theft and fraud, including increased spam and phishing communications; (f) time and money expended and to be expended mitigating the consequences of the Data Breach; (g) anxiety, emotional distress, and loss of privacy; and (h) diminution of the value of their Private Information.

10. Plaintiff brings this action to hold Defendants accountable and to obtain damages, restitution, and injunctive and declaratory relief requiring Defendants to implement and maintain reasonable data security practices—including encryption, multi-factor authentication, regular penetration testing, appropriate access controls, and reasonable data retention and deletion



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

policies—and to provide adequate credit monitoring and identity theft protection services to Plaintiff and Class Members, among other relief.

## THE PARTIES

11. Plaintiff Frankie Moreno is, and at all relevant times has been, a citizen and resident of Prosper, Texas.

12. Defendant Redfin Corporation is a Delaware corporation with its principal place of business located at 1099 Stewart Street, Suite 600, Seattle, Washington 98101. Redfin's registered agent is located at 711 Capitol Way S, Suite 204, Olympia, Washington 98501.

13. Defendant Rocket Limited Partnership d/b/a Rocket Companies is a Michigan limited partnership with its principal place of business located at 1050 Woodward Avenue, Detroit, Michigan 48226. Rocket's registered agent is located at 40600 Ann Arbor Road E, Suite 201, Plymouth, Michigan 48170.

14. Upon information and belief, Rocket, as Redfin's parent company, exercises control over and participates in decisions regarding the systems, policies, and practices by which Redfin collects, maintains, and secures the Private Information of its employees and others. Defendants were at all relevant times responsible for protecting the confidentiality, integrity, and security of the Private Information in their possession, custody, or control.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Class; and at least one member of the Class, including Plaintiff, is a citizen of a state different from at least one Defendant.

16. This Court has personal jurisdiction over Redfin because Redfin maintains its headquarters and principal place of business in Washington, regularly conducts business in Washington, and, upon information and belief, made the data security decisions at issue in this action in Washington.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

17. This Court has personal jurisdiction over Rocket because Rocket regularly conducts business in Washington, has sufficient minimum contacts with Washington, and, upon information and belief, directs and controls the operations of its Seattle-based subsidiary, Redfin, including with respect to the data security practices at issue in this action.

18. Venue is proper in this District because Redfin resides in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims—including Defendants' data security decisions and the maintenance of Plaintiff's and Class Members' Private Information—occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Defendants' Collection and Storage of Private Information

19. Redfin is a residential real estate brokerage operating its business throughout the country.[6] Rocket is a homeownership platform and the parent company of Redfin.[7]

20. In the regular course of their business, Defendants collect, store, process, and maintain vast amounts of sensitive Private Information, including the Private Information of their current and former employees.

21. As a condition of employment, Defendants required Plaintiff and other employees to provide extensive Private Information, including, but not limited to, their full names, contact information, dates of birth, Social Security numbers, driver's license numbers, and bank account information.

22. Upon information and belief, Defendant Redfin made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

---

[6] *Why Redfin*, REDFIN, https://www.redfin.com/why-redfin (last visited Oct. 13, 2026).

[7] *About Us*, ROCKET COMPANIES, https://www.rocketcompanies.com/who-we-are/about-us/ (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

23. Plaintiff and Class Members provided their Private Information to Defendant Redfin with the reasonable expectation and on the mutual understanding that Defendant Redfin would comply with its obligations to keep such information confidential and secure from unauthorized access.

24. By collecting this Private Information, Defendants assumed legal and equitable obligations to Plaintiff and Class Members to protect, safeguard, and keep confidential their Private Information. These obligations arise under federal and state statutes and regulations, industry standards, and the reasonable expectations that employees place in their employers to maintain the security and confidentiality of sensitive personal data.

25. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable understanding and expectation that Defendants would comply with applicable laws, regulations, and industry standards to keep such information confidential and protected from unauthorized access. Defendants received significant economic value from the receipt and use of Plaintiff's and Class Members' Private Information, which Defendants used to hire, pay, and administer the workforce on which their business depends.

26. As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures and adequate security to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties.

27. Upon information and belief, Defendants did not implement reasonable cybersecurity safeguards or policies to protect Plaintiff's and Class Members' Private Information, or supervise their employees and vendors to prevent, detect, and stop breaches of their networks or systems. As a result, Defendants left significant vulnerabilities in their systems for cybercriminals to exploit and gain access to Plaintiff's and Class Members' Private Information.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**B. Background on Defendant Rocket**

28. Defendant Rocket is a homeownership platform and the parent company of Defendant Redfin.[8]

29. Upon information and belief, Defendant Rocket made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

30. Plaintiff and Class Members provided their Private Information to Defendant Rocket with the reasonable expectation and on the mutual understanding that Defendant Rocket would comply with its obligations to keep such information confidential and secure from unauthorized access.

31. As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Defendant Rocket had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and Class Members' Private Information from disclosure to third parties.

**C. The Data Breach**

32. Upon information and belief, at a time Defendants have not disclosed, an unauthorized third party gained access to Defendants' computer systems and accessed and acquired Private Information stored within those systems.

33. Defendant Redfin learned that Private Information contained in its network was accessed by the unauthorized third party and subsequently filed a Notice of Incident with the Massachusetts Office of Consumer Affairs and Business Regulation on September 24, 2026.[9]

---

[8] *About Us*, ROCKET COMP., https://www.rocketcompanies.com/who-we-are/about-us/ (last visited Oct. 13, 2026)

[9] *Notice of Security Incident, Redfin Corporation* (Sept. 23, 2026), MASS. OFF. OF CONSUMER AFFS. & BUS. REGUL., https://www.mass.gov/doc/2026-1615-redfin-corporation/download (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

34. Upon information and belief, the data elements compromised in the Data Breach include: (a) names; (b) Social Security numbers; (c) financial account information; and (d) driver's license numbers.[10]

35. Omitted from the Notice Letter are the identity of the cybercriminals who perpetrated the Data Breach, the date or dates on which the Data Breach occurred, the length of time the cybercriminals had access to Defendants' systems, the date on which Defendants discovered the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, the specific categories of Private Information compromised for each recipient, and the remedial measures undertaken to ensure such a breach does not occur again.

36. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37. Despite Defendants' opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter and Defendants' regulatory filings, including: (a) that the Data Breach was the work of cybercriminals; (b) that the cybercriminals infiltrated Defendants' networks and systems; and (c) that, once inside Defendants' networks and systems, the cybercriminals accessed and, upon information and belief, exfiltrated information including Plaintiff's and Class Members' Private Information.

38. Defendants' recommendation that recipients place credit freezes and fraud alerts, and their offer of two years of identity protection services, confirm that Defendants recognize that Plaintiff and Class Members face a present and substantial risk of identity theft and fraud as a result of the Data Breach.

39. Given that the cybercriminals were able to infiltrate Defendants' information systems and access highly sensitive Private Information—activity that should have had alarm bells ringing—

---

[10] *2026 Data Breach Notification Report,* MASS. OFF. OF CONSUMER AFFS. & BUS. REGUL., https://www.mass.gov/doc/data-breach-report-2026/download (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

it is likely that Defendants failed to implement reasonable, industry-standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as endpoint detection and response ("EDR"), extended detection and response ("XDR"), data loss prevention tools, and centralized alerting and logging.

40. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals access to Plaintiff's and Class Members' Private Information.

41. Given Defendants' failure to meet even the most basic requirements of cybersecurity, it is likely that Defendants' cybersecurity program as a whole is severely inadequate in comparison to the measures they are legally obligated to provide to individuals whose Private Information they collect, thus leaving those individuals exposed to the Data Breach that indeed came to fruition.

**D. The Data Breach Was a Foreseeable Risk of Which Defendants Were on Notice**

42. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as verifying eligibility for employment, opening a new bank account or securing access to credit at favorable rates, buying or renting a home, and accessing benefits.

43. In light of recent high-profile data breaches, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

44. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[11]

45. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years. In light of past high-profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March

[11] 2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or, if acting as a reasonable business, should have known that the Private Information they collected and maintained would be vulnerable to and targeted by cybercriminals.

46. Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.[12]

47. These significant increases in attacks on companies, and the attendant risk of future attacks, are widely known to the public and to anyone in Defendants' industries, including Defendants. Indeed, Defendants operate in the residential real estate and mortgage industries, in which businesses routinely collect and maintain large volumes of highly sensitive personal and financial information, making them attractive targets for cybercriminals.

48. This readily available and accessible information confirms that, prior to the Data Breach, Defendants knew or should have known that (i) ransomware actors and other cybercriminals were targeting entities such as Defendants; (ii) ransomware gangs and other cybercriminals were ferociously aggressive in their pursuit of entities such as Defendants; (iii) ransomware gangs and other cybercriminals were leaking corporate information on dark web portals; and (iv) ransomware tactics included extortion and threatening to release stolen data.

49. Defendants should have been aware, and indeed were aware, that they were at risk of a data breach that could expose the Private Information that they solicited, collected, stored, and maintained.

50. Despite their knowledge of these risks, Defendants failed to implement adequate security measures to safeguard the Private Information of Plaintiff and Class Members.

**E. Defendants' Inadequate Data Security Practices**

51. Defendants were required by law and industry standards to implement and maintain reasonable data security measures to protect the Private Information in their possession. These

---

[12] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

obligations are established by, among other sources: (a) Section 5 of the FTC Act, 15 U.S.C. § 45; (b) Federal Trade Commission ("FTC") guidance and enforcement actions; (c) state data security and breach notification statutes; (d) National Institute of Standards and Technology ("NIST") frameworks; and (e) industry best practices for cybersecurity.

52. Upon information and belief, Defendants failed to implement and maintain reasonable and adequate security measures to protect Plaintiff's and Class Members' Private Information from unauthorized access and exfiltration. Specifically, and upon information and belief, Defendants' failures include, but are not limited to, one or more of the following: failure to implement or enforce adequate access controls, including multi-factor authentication; failure to encrypt Private Information at rest and in transit; failure to conduct regular and adequate risk assessments; failure to implement adequate intrusion detection and prevention systems; failure to adequately monitor their networks for unauthorized access; failure to maintain adequate logging and auditing capabilities; failure to train employees on cybersecurity best practices; failure to patch known vulnerabilities in a timely manner; failure to ensure that employees and third-party vendors practice the principle of least privilege and maintain credential hygiene; failure to adequately oversee third-party vendors with access to Private Information; and failure to implement reasonable data retention and disposal policies. The specific security failures will be further detailed through discovery.

53. Federal and state governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and institutions. The FTC has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[13]

54. Among other things, FTC guidelines provide that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer

[13] *See Start With Security*, FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[14] The FTC further recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

55. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personal information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. Upon information and belief, Defendants failed to comply with the data security standards established by the FTC's guidance and enforcement actions.

56. To prevent and detect unauthorized cyberattacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

---

[14] *See Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

57. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

a. Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .

b. Use caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

c. Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d. Keep your personal information safe. Check a website's security to ensure the information you submit is encrypted before you provide it . . . .

e. Verify email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any

---

[15] FBI, HOW TO PROTECT YOUR NETWORKS FROM RANSOMWARE 3–4, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document) (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f. Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g. Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . . .[16]

58. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

> **Secure internet-facing assets**: apply latest security updates; use threat and vulnerability management; perform regular audit; remove privileged credentials;
>
> **Thoroughly investigate and remediate alerts**: prioritize and treat commodity malware infections as potential full compromise;
>
> **Include IT Pros in security discussions**: ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
>
> **Build credential hygiene**: use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;
>
> **Apply principle of least-privilege**: monitor for adversarial activities; hunt for brute force attempts; monitor for cleanup of Event Logs; analyze logon events;
>
> **Harden infrastructure**: use Windows Defender Firewall; enable tamper protection; enable cloud-delivered protection; turn on attack

[16] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (Apr. 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

> surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[17]

59. Given that Defendants were storing the Private Information of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks. Upon information and belief, Defendants failed to do so.

60. Upon information and belief, Defendants failed to meet the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls ("CIS CSC"), which are established standards in reasonable cybersecurity readiness.

61. The foregoing frameworks are existing and applicable industry standards, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**F. The Value of Private Information and the Harm Caused by Its Theft**

62. The Data Breach has placed Plaintiff and Class Members at an increased risk of fraud and identity theft.

63. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiff's and Class Members' Private Information falling into the hands of identity thieves.

64. The Consumer Financial Protection Bureau defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority," and describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification

---

[17] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3.

65. The unencrypted Private Information of Class Members has already ended up, or will end up, for sale on the dark web because that is the modus operandi of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

66. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

67. The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—Social Security numbers, names, and driver's license numbers—is impossible to "close" and difficult, if not impossible, to change.

68. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[21]

---

[18] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[19] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[20] *For Sale in the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited Oct. 13, 2026).

[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

69. Social Security numbers are among the most damaging pieces of information to lose. As the Social Security Administration warns, a dishonest person who has a Social Security number can use it to get other personal information and to apply for credit, open accounts, and commit other frauds in the victim's name, and a victim may not find out that someone is using his or her number until being turned down for credit or contacted by creditors about unpaid bills.[22]

70. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the cybercriminal to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

71. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

72. Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access "Fullz packages" of that person to gain access to the full suite of additional Private Information that those cybercriminals have access to through other means. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

73. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even

---

[22] *See Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

74. Driver's license numbers, which were compromised in the Data Breach, are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[23] "A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[24]

75. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[25] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification or use the information to craft curated social engineering phishing attacks."[26]

76. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a New York Times article.[27]

77. Financial account information, which was also compromised in the Data Breach, can be used by criminals to make unauthorized withdrawals or transfers, to impersonate the account holder in communications with financial institutions, and to lend credibility to phishing and social engineering attempts aimed at gaining access to the victim's accounts.

---

[23] Lee Mathews, *Hackers Stole Consumers' License Numbers from Geico in Months-Long Breach*, FORBES (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/.

[24] *Id.*

[25] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAG. (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[26] *Id.*

[27] *How Identity Thieves Took My Wife for a Ride*, N.Y. TIMES (Apr. 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

78. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victims' names; hackers taking over email and other online accounts; time and effort to repair credit scores; losing a home due to mortgage and deed fraud; theft of tax refunds; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victims' names; victims' personal data circulating on the dark web forever; and victims receiving increased spam telephone calls and emails.

79. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[28]

80. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, 33% reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[29]

81. Pieces of Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. There is a strong probability that entire batches of stolen information have been or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

---

[28] *What To Do Right Away*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited Oct. 13, 2026).

[29] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identity Crime Victims*, IDENTITY THEFT RES. CTR. (May 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

82. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[30]

83. Thus, Plaintiff and Class Members must vigilantly monitor their financial and credit accounts for many years to come.

84. Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and should have strengthened their data systems accordingly.

**G. Plaintiff's and Class Members' Injuries**

85. As a direct and proximate result of the Data Breach and Defendants' failures, Plaintiff and Class Members have suffered and will continue to suffer actual, concrete injuries, including but not limited to the following:

a. The unauthorized access, exfiltration, and exposure of their Private Information to criminal third parties;

b. Actual and attempted fraud and misuse of their Private Information;

c. A substantially heightened and imminent risk of identity theft, financial fraud, tax fraud, phishing, and other criminal misuse of their Private Information;

d. Loss of the value of the privacy and confidentiality of their Private Information;

e. Out-of-pocket expenses and time spent monitoring financial accounts and credit reports for evidence of fraud or misuse;

---

[30] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, PERSONAL INFORMATION: DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN 29 (June 2007), https://www.gao.gov/new.items/d07737.pdf.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

f. Out-of-pocket expenses and time spent investigating the Data Breach and taking responsive protective measures;

g. The cost of credit monitoring, identity theft protection, and other mitigation services;

h. Loss of the benefit of the bargain;

i. Diminution in the value of their Private Information;

j. Anxiety, emotional distress, and mental anguish arising from the knowledge that their sensitive Private Information has been accessed by an unauthorized actor and may be used against them at any time; and

k. The continuing risk to their Private Information, which remains in Defendants' possession and may be subject to further breaches, absent adequate remedial measures.

86. Defendants' conduct, as described herein, has caused real, immediate, and continuing harm to Plaintiff and Class Members. Even for those individuals who have not yet experienced actual identity theft or fraud, the unauthorized acquisition of their Private Information by a criminal actor establishes a concrete and imminent injury that is not speculative.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

87. Because of the recognized risk of identity theft, when a data breach occurs and an individual learns that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

88. The United States Department of Justice's Bureau of Justice Statistics has found that identity theft victims reported spending an average of seven hours resolving issues related to identity theft or fraud.[31]

[31] *See* Erika Harrell, *Victims of Identity Theft, 2014*, BUREAU OF JUST. STAT., U.S. DEP'T OF JUST. (Sept. 2015), https://bjs.ojp.gov/library/publications/victims-identity-theft-2014.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

89. By spending this time, Plaintiff and Class Members were not manufacturing their own harm but were taking necessary steps at Defendants' direction. Indeed, Defendants' own Notice Letter encourages recipients to place security freezes, consider fraud alerts, review account statements and credit reports for unfamiliar activity, and be alert to phishing emails.[32]

90. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

91. These efforts are consistent with the GAO's observation that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[33]

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

92. Based on the value of the information stolen, the data either has been or will be sold to cybercriminals whose mission is to perpetrate identity theft and fraud. Even if the data is not posted online, it is ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

93. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

94. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information. The two years of identity protection offered by Defendants does not cover this cost.

---

[32] Notice of Security Incident, *supra* note 4.
[33] *See* GAO-07-737, *supra* note 30.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

***Diminution in Value of Private Information***

95. PII is a valuable property right.[34] Its value is axiomatic, considering the value of Big Data in corporate America and that cyber theft convictions include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

96. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[35]

97. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

98. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

99. Additionally, Plaintiff and Class Members further seek to recover the value of the unauthorized access to their Private Information caused by Defendants' wrongful conduct. This measure of damages is analogous to remedies for the unauthorized use of intellectual property. Like technology protected by a trade secret, a person's Private Information is non-rivalrous—the unauthorized use by a third party does not diminish the owner's own ability to use such information,

---

[34] *See, e.g.*, John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[35] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[36] *See, e.g.*, DATACOUP, https://datacoup.com/ (last visited Oct. 13, 2026).

[37] *Frequently Asked Questions*, NIELSEN COMPUT. & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 13, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

yet the owner may recover the reasonable value of its use, i.e., a "reasonable royalty," from the unauthorized user. A similar royalty or license measure of damages is appropriate here because: (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, including evidence regarding the price at which similar data is transacted on both legitimate and illegitimate markets.

***Lost Benefit of the Bargain***

100. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendants with their Private Information as a condition of employment or for services, Plaintiff and Class Members understood and expected that they were, in part, exchanging their labor or money and Private Information for compensation or services that included reasonable data security to protect the Private Information they were required to provide. Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received employment or services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

101. Data security is a primary concern for consumers and workers alike. In its 2024 Consumer Privacy Survey, Cisco reported that 89% of consumers stated that "I care about data privacy," and that more than 75% of consumer respondents said they will not purchase from an organization they do not trust with their data.[38]

**PLAINTIFF FRANKIE MORENO'S EXPERIENCE AND INJURIES**

102. Plaintiff Moreno is a former employee of Redfin. She was employed by Redfin from approximately September 2020 to November 2022.

103. As a condition of her employment, Plaintiff Moreno was required to provide her Private Information to Defendants, including her name, contact information, date of birth, Social

[38] *Privacy Awareness: Consumers Taking Charge to Protect Personal Information*, CISCO (2024), https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Security number, driver's license number, and bank account information, which was then stored on Defendants' computer systems and network.

104. Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff's Private Information in their system, and Defendants had access to it.

105. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

106. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has spent significant time dealing with the Data Breach— valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

107. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) misuse of Private Information; (ii) spam calls and communications; (iii) invasion of privacy; (iv) theft of her Private Information; (v) lost or diminished value of Private Information; (vi) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) loss of benefit of the bargain; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

108. Plaintiff suffered actual injury from the dramatic increase in spam, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

109. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

110. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

111. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

112. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

113. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did had she known that her Private Information would be maintained using inadequate data security systems

## CLASS ALLEGATIONS

114. Plaintiff brings this class action, individually and on behalf of the following Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4):

> **Nationwide Class**: All persons in the United States whose Private Information was compromised as a result of the Data Breach (the "Class").

115. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

116. Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

117. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Federal Rule of Civil Procedure 23.

118. **Numerosity**: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendants, upon information and belief, the Class consists of thousands of members. The Class is sufficiently numerous to warrant certification.

119. **Typicality of Claims**: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class Members, had her Private Information compromised because of the Data Breach. Plaintiff is a member of the Class, and her claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members, which was caused by the same misconduct by Defendants.

120. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation, including data breach litigation, and who will prosecute this action vigorously.

121. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

122. **Commonality and Predominance**: Defendants engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiff and the other members of the



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants' storage and retention of Plaintiff's and Class Members' Private Information was done in a negligent manner;

d. Whether Defendants had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e. Whether Defendants breached that duty;

f. Whether Defendants' conduct violated Plaintiff's and Class Members' privacy;

g. Whether Defendants provided timely and adequate notice of the Data Breach;

h. Whether Defendants were unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

123. **Manageability**: The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants.

124. **Ascertainability**: All members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses, and adequate notice can be given to Class Members directly using information maintained in Defendants' records.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

125. **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

126. **Issue Certification**: Likewise, particular issues are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein, including the common questions identified above.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(On Behalf of Plaintiff and the Class)

127. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

128. Defendants knowingly solicited, collected, stored, and maintained the Private Information of Plaintiff and Class Members on inadequately secured computer systems and networks.

129. Upon accepting and storing Plaintiff's and Class Members' Private Information on their computer systems and networks, Defendants undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

130. Defendants had full knowledge of the sensitivity of the Private Information in their possession and the types of harm that Plaintiff and Class Members could and would suffer if the



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Private Information was wrongfully accessed or disclosed. Plaintiff and Class Members were therefore the foreseeable victims of any inadequate data security practices.

131. Defendants owed a duty to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing their networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication.

132. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

133. Defendants also owed a duty to delete, or otherwise remove from their networks, Private Information they no longer had a legitimate business need to maintain.

134. Defendants owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

135. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

136. Section 5 of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data. The FTC publications and orders described above also formed part of the basis of Defendants' duty in this regard. Defendants' violation of Section 5 of the FTC Act, and of the state data security and breach notification statutes described above, constitutes evidence of their negligence.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

137. Defendants' duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members, who were Defendants' employees and/or customers. Defendants were in a superior position to ensure that their data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

138. Defendants knew Plaintiff and Class Members relied on them to protect their Private Information. Plaintiff and Class Members were not in a position to assess the data security practices used by Defendants. Because they had no means to identify Defendants' security deficiencies, Plaintiff and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendants exercised control over the Private Information stored on their systems and networks; accordingly, Defendants were best positioned and most capable of preventing the harms caused by the Data Breach.

139. Defendants' duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

140. Defendants were aware, or should have been aware, of the fact that cybercriminals routinely target entities storing PII through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendants knew of a foreseeable risk to their data security systems but failed to implement reasonable security measures.

141. Defendants breached their duties by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiff's and Class Members' Private Information;



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

b. Failing to adequately monitor the security of their networks and systems to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Private Information;

c. Failing to periodically ensure that their computer systems and networks had plans in place to maintain reasonable data security safeguards;

d. Failing to implement and maintain adequate data retention and deletion policies and procedures, and retaining the Private Information of former employees longer than necessary;

e. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

f. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

g. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

142. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

143. Plaintiff and the Class are within the class of persons that Section 5 of the FTC Act and the state data security and breach notification statutes were intended to protect, and the harm that has occurred is the type of harm those statutes were intended to guard against.

144. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

145. But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

146. Through Defendants' failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendants prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach.

147. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) actual and attempted fraud; (ii) the loss of the opportunity to determine for themselves how their Private Information is used; (iii) the publication and theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (v) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach; (vi) costs associated with placing freezes on credit reports and password protections; (vii) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (viii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and (ix) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives.

148. Plaintiff and the Class have suffered cognizable injuries and are entitled to actual, compensatory, and nominal damages in an amount to be proven at trial.

## COUNT II
## BREACH OF IMPLIED CONTRACT
(On Behalf of Plaintiff and the Class)

149. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

150. Defendants solicited, collected, stored, and maintained Plaintiff's and Class Members' Private Information as part of Defendants' regular business practices.

151. Defendants required Plaintiff and Class Members to provide and entrust their Private Information as a mandatory condition of obtaining employment or services with Defendants, and Plaintiff and Class Members entrusted their Private Information to Defendants pursuant to this condition.

152. When Plaintiff and Class Members provided their Private Information to Defendants, they entered into implied contracts with Defendants pursuant to which Defendants agreed to safeguard and protect such Private Information, to keep such information secure and confidential, to delete it when it was no longer needed, and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

153. Plaintiff and Class Members reasonably expected that the Private Information they entrusted to Defendants would remain confidential and would not be shared with or disclosed to criminal third parties.

154. Plaintiff and Defendants had a mutual understanding that Defendants would implement and maintain adequate and reasonable data security practices and procedures to protect Plaintiff's and Class Members' sensitive Private Information. Plaintiff and Defendants also shared an expectation and understanding that Defendants would not share or disclose, whether intentionally or unintentionally, the sensitive Private Information in their possession and control.

155. Defendants promised and warranted to Plaintiff and Class Members, including through their conduct and their privacy policies, to maintain the privacy and confidentiality of the Private Information they collected from them and to keep such information safeguarded against unauthorized access and disclosure.

156. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information and their labor or payment to Defendants in exchange for, amongst other things, compensation and the protection of their Private Information.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

157. The implied promise of confidentiality includes consideration beyond those pre-existing duties owed under Section 5 of the FTC Act and other state and federal laws. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

158. The implied promises include, but are not limited to: (i) taking steps to ensure any agents or vendors who are granted access to Private Information protect the confidentiality of that information; (ii) taking steps to ensure that Private Information in the possession and control of Defendants, their agents, and/or vendors is restricted and limited to achieve an authorized business purpose; (iii) restricting access to qualified and trained agents and/or vendors; (iv) designing and implementing appropriate retention policies to protect the Private Information from unauthorized access and disclosure; (v) applying or requiring proper encryption of the Private Information; (vi) requiring multifactor authentication for access to the Private Information; and (vii) other steps necessary to protect against foreseeable data breaches.

159. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of such implied contracts.

160. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

161. Defendants breached the implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' Private Information, by failing to delete Private Information they no longer needed, and by failing to provide them with timely and accurate notice of the Data Breach.

162. As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members have suffered damages, including foreseeable consequential damages that Defendants knew about when they solicited and collected Plaintiff's and Class Members' Private Information.

163. At minimum, as a result of Defendants' breach of implied contract, Plaintiff and Class Members will have to spend money for future costs of credit monitoring and theft protection, which



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

are reasonably necessary given the type of highly sensitive data stolen in the Data Breach, including Social Security numbers.

164. As a result of Defendants' failures to provide the data security protections promised, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendants. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in value between the employment with data security protection they bargained for and that which they received.

165. Plaintiff and the Class have suffered injuries as described above and are entitled to actual, consequential, and nominal damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Class)

166. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

167. Plaintiff alleges this claim in the alternative to her breach of implied contract claim.

168. Plaintiff and Class Members conferred a benefit upon Defendants by providing Defendants with their Private Information.

169. By conferring their Private Information on Defendants, Plaintiff and Class Members reasonably understood that Defendants would be responsible for securing their Private Information from unauthorized access and disclosure.

170. Protecting the Private Information of Plaintiff and Class Members is integral to Defendants' business. Without their employees' Private Information, Defendants would be unable to hire, pay, and administer the workforce that performs Defendants' core business. Without their customers' Private Information, Defendants would be unable to provide their services or perform Defendants' core business.

171. Plaintiff's and Class Members' Private Information has monetary value.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

172. Defendants appreciated and had knowledge of the benefits conferred upon them by Plaintiff and Class Members, and accepted and retained those benefits. Defendants profited from and used Plaintiff's and Class Members' Private Information for business purposes.

173. Under the facts and circumstances outlined above, however, it is inequitable for Defendants to retain those benefits without payment of the value thereof.

174. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and by retaining data they no longer needed rather than incurring the cost of securely disposing of it. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite data security.

175. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' Private Information because Defendants failed to adequately protect their Private Information. Plaintiff and the proposed Class would not have provided their Private Information to Defendants had they known Defendants would not adequately protect it.

176. Defendants acquired Plaintiff's and Class Members' Private Information through inequitable means in that they failed to disclose their inadequate data security practices, as previously alleged.

177. Plaintiff and Class Members have no adequate remedy at law.

178. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including, but not limited to, the injuries described above.

179. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, all gains that they unjustly received.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**COUNT IV**
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION AND PUBLIC DISCLOSURE OF PRIVATE FACTS**
(On Behalf of Plaintiff and the Class)

180. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

181. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

182. Plaintiff and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

183. Defendants owed a duty to their employees, including Plaintiff and the Class, to keep this information confidential.

184. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' Private Information is highly offensive to a reasonable person.

185. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendants, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

186. Defendants' conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the proposed Class.

187. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

188. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

189. Defendants acted with a knowing state of mind when they failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

190. As the Restatement explains, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A cmt. a (1965). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. b.

191. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that their failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's and Class Members' privacy.

192. As a proximate result of Defendants' acts and omissions, the Private Information of Plaintiff and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

193. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their Private Information is still maintained by Defendants with their inadequate cybersecurity system and policies.

194. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the Private Information of Plaintiff and the Class.

195. In addition to injunctive relief, Plaintiff, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendants' invasion of privacy, which includes



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the value of the privacy interest invaded by Defendants and the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**COUNT V**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86**
(On Behalf of Plaintiff and the Class)

196. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 126 above as if fully set forth herein.

197. The Washington Consumer Protection Act (the "CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

198. Defendants are each a "person" within the meaning of RCW 19.86.010(1).

199. Defendants engage in "trade" and "commerce" within the meaning of RCW 19.86.010(2) in that they engage in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

200. Redfin is headquartered in Washington; its strategies, decision-making, and commercial transactions originate in Washington; upon information and belief, most if not all of its key operations and employees reside, work, and make company decisions (including data security decisions) in Washington; and Redfin and many of its employees are part of the people, residents, and citizens of the State of Washington. Accordingly, the unfair and deceptive conduct alleged herein emanated from Washington.

201. In the course of conducting their business, Defendants committed "unfair acts or practices" by, among other things, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Private Information, and by retaining Private Information they no longer needed. Defendants' unfair acts and practices are ongoing and continue to this date.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

202. Defendants' conduct was also deceptive. Defendants failed to disclose, and concealed, that their data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information, and failed to timely and adequately notify Plaintiff and Class Members of the unauthorized release and disclosure of their Private Information. Had Plaintiff and Class Members been notified in an appropriate fashion, they could have taken earlier and more robust precautions to safeguard and protect their Private Information and identities.

203. Defendants' unfair or deceptive acts or practices affect the public interest because they injured Plaintiff and numerous other persons, had the capacity to injure other persons, and have the capacity to injure other persons.

204. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in their wrongful conduct.

205. Defendants' unfair and deceptive acts and practices directly and proximately caused injury to Plaintiff's and Class Members' business and property. Plaintiff and Class Members have suffered, and will continue to suffer, actual damages and injury in the form of, among other things: (1) an imminent, immediate, and continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of their Private Information; (4) deprivation of the value of their Private Information, for which there is a well-established national and international market; (5) the financial cost of monitoring credit, monitoring financial accounts, and mitigating damages; and/or (6) the investment of substantial time and money in monitoring and remediating the harm inflicted upon them.

206. Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct, and more data breaches will occur. Plaintiff, therefore, on behalf of herself, Class Members, and the general public, also seeks restitution and an injunction prohibiting Defendants from continuing such wrongful conduct and requiring Defendants to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes,



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Private Information.

207. Plaintiff, on behalf of herself and the Class, seeks to recover actual damages sustained by each Class Member, together with the costs of suit, including reasonable attorneys' fees. In addition, Plaintiff, on behalf of herself and the Class, requests that the Court increase the damages award for each Class Member to three times the actual damages sustained, not to exceed $25,000 per Class Member.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

A. An order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. An order declaring that Defendants' conduct violates the laws referenced herein;

C. Judgment in favor of Plaintiff and the Class on all counts asserted herein;

D. Awards of restitution and actual, compensatory, consequential, nominal, and statutory damages, including treble damages, in amounts to be determined at trial;

E. Declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F. Injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

G. Injunctive relief enjoining Defendants from further deceptive practices related to data security, the Data Breach, and the compromised Private Information;

H. An award of attorneys' fees and costs, as allowed by law;

I. An award of pre- and post-judgment interest, as provided by law; and

J. Such further relief to which Plaintiff and the Class may be entitled.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 14, 2026

Respectfully submitted,

*/s/ Kaleigh N. Boyd*
Kaleigh N. Boyd, WSBA No. 52684
**MCNAUL EBEL PLLC**
600 University Street, Suite 2700
Seattle, Washington 98101
Phone: (206) 467-1816
Fax: (206) 624-5128
Email: kboyd@mcnaul.com

J. Gerard Stranch, IV (*pro hac vice* forthcoming)
Grayson Wells (*pro hac vice* forthcoming)
Sam Douthit (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
Email: gstranch@stranchlaw.com
gwells@stranchlaw.com
sdouthit@stranchlaw.com

*Attorneys for Plaintiff and the Proposed Class*